IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Jennifer White, | ) | Civil Action No. 6:13-1935-BHH-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on April 6, 2009, alleging that she became unable to work on September 8, 2008.  The applications were denied initially and on reconsideration by the Social Security Administration.  On August 26, 2010, the plaintiff

---

[1]  Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013.  Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff appeared on February 14, 2012, considered the case *de novo* and, on February 28, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on May 21, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

> (2)    The claimant has not engaged in substantial gainful activity since September 8, 2008, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

> (3)    The claimant has the following severe combination of impairments: disorders of the spine, piriformis syndrome, and fibromyalgia (20 C.F.R. §§  404.1520(c) and 416.920(c)).

> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b). I find claimant can frequently lift or carry 10 pounds, occasionally lift or carry 20 pounds, sit for 6 hours of an 8 hour workday, and stand or walk for 6 hours of an 8 hour workday. I also find claimant can frequently balance, kneel, crouch, and climb ramps and stairs, occasionally crawl and stoop, and never climb ladders, ropes and scaffolds. I further find claimant should avoid concentrated exposure to hazards.

> (6)    The claimant is capable of performing past relevant work as an administrative clerk. This work does not require the performance of work-related activities precluded by the

2

claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant has not been under a disability, as defined in the Social Security Act, from September 8, 2008, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

On July 12, 2007, the plaintiff had a cervical MRI that showed mild disc desiccation (Tr. 358). On December 7, 2007, Allen Gamble, M.D., evaluated the plaintiff. Dr. Gamble is the plaintiff's primary care physician. The plaintiff reported constant pain for years and sleep difficulty. Dr. Gamble diagnosed malaise and fatigue, myalgia, and insomnia. He prescribed Cymbalta and advised follow-up treatment with a rheumatologist (Tr. 872).

On January 4, 2008, Dr. Gamble reevaluated the plaintiff. She reported being more tired than the previous month. The plaintiff also reported that Cymbalta had helped her pain but made her feel more depressed (Tr. 871). On January 25, 2008, the plaintiff continued to be depressed and "just not feeling like [herself]." Dr. Gamble noted that the plaintiff appeared tired and her mood seemed flat. He added Wellbutrin and amitriptyline to her medications (Tr. 870).

On February 8, 2008, the plaintiff continued to be depressed and have anxiety. She reported increased smoking since starting Wellbutrin despite taking Chantix (Tr. 869). On February 11, 2008, Amir Agha, M.D., of Foothills Rheumatology, evaluated the plaintiff and noted that she was diagnosed with fibromyalgia in 2007. The plaintiff reported a several year history of joint pain, which she described as "generalized, deep, dull, and aching and associated with stiffness and myalgias." The plaintiff also reported "staying tired all day" and having no energy. On examination, Dr. Agha indicated that the plaintiff's low back was tender, and she had mild crepitus in her knees. The plaintiff's

5

fibromyalgia tender points were also tender.  Dr. Agha diagnosed fibromyalgia.  He started the plaintiff on Zanaflex and Mobic and decreased her dose of Cymbalta due to complaints of increased depression.  Dr. Agha also prescribed Ultram and Neurontin and encouraged range of motion exercises (Tr. 400-01).  Dr. Agha performed follow-up examinations and adjusted the plaintiff's medications on March 6, 2008, May 8, 2008, July 10, 2008, and September 4, 2008 (Tr. 396-99).

On February 22, 2008, Dr. Gamble evaluated the plaintiff.  She reported more body aches than usual with the cold weather (Tr. 868).  On March 28, 2008, the plaintiff reported that her medication was working well, and she only had two bad days in the month. Dr. Gamble indicated that the plaintiff's insomnia was improved (Tr. 867).

On May 7, 2008, Abhey Patel, D.C., evaluated the plaintiff for intermittent low back pain radiating down her right leg to her foot.  The plaintiff reported that her symptoms began with lifting during household activities.  The plaintiff indicated that her pain was increased with prolonged positions and sitting and decreased with medications and heat. Her lumbar range of motion was limited due to pain.  She had tenderness to palpation and decreased hamstring flexibility.  Dr. Patel noted that the plaintiff had a scoliotic curve present with convex in the right mid-thoracic spine.  The plaintiff had a positive FABRE test in her right hip and decreased mobility with springing and pain at L4 and L5.  Dr. Patel diagnosed sciatica, nonallopathic lesions of the lumbar spine, and lumbago (Tr. 369-70). Dr. Patel scheduled treatments for the plaintiff two to three times a week for six to twelve visits (Tr. 371-75).

On June 17, 2008, the plaintiff had a lumbar spine MRI which showed mild scoliosis of the thoracolumbar spine and mild degenerative changes at L2-L3 and L3-L4 (Tr. 878-79).  On June 27, 2008, Dr. Gamble evaluated the plaintiff for back pain and leg pain. Dr. Gamble's diagnoses included insomnia, anxiety, and sciatica.  He prescribed Xanax (Tr. 865).  On July 31, 2008, the plaintiff requested a psychological consult and complained of

6

problems related to her daughter's father.  Dr. Gamble's diagnoses included adjustment reaction and anxiety (Tr. 864).

The plaintiff underwent a psychiatric evaluation with Geera Desai, M.D., on August 6, 2008 (Tr. 569-70).  She complained of difficulty dealing with stress and problems with guilt.  The plaintiff stated that her sleep was poor, she had a lot of physical pain, she worried constantly, and she had a poor memory.  She denied problems with depression. (Tr. 569).  On mental status examination, the plaintiff exhibited poor eye contact, and she appeared quite anxious, but she had good insight and readily talked about various stressors.  Dr. Desai indicated that the plaintiff spoke in a low monotone voice and had obvious psychomotor retardation.   Dr. Desai diagnosed her with generalized anxiety disorder with panic attacks and fibromyalgia.  She was given prescriptions for Prozac and Xanax, was referred for a sleep study, and was referred to "Reba" to work on her situational problems (Tr. 570).  When the plaintiff returned to Dr. Desai six weeks later, she reported that she had been fired from her job after questioning one of the partners with whom she worked about some accounting irregularities.  She tried to push herself to do things around the house and at various places (Tr. 571).

On August 30, 2008, the plaintiff was treated in the emergency room for right elbow pain and swelling.  She was diagnosed with a ganglion cyst with inflammation.  She was given pain medications and advised to seek follow-up (Tr. 387-92).  On September 3, 2008, Michael Kissenberth, M.D., evaluated the plaintiff for right elbow pain and a right elbow mass.  He diagnosed a ganglion cyst and scheduled an excisional biopsy (Tr. 376-80).  On September 25, 2008, Dr. Gamble evaluated the plaintiff for right elbow pain. Her elbow continued to be red and swollen (Tr. 863).

On October 27, 2008, Dr. Agha reevaluated the plaintiff for continued arthralgia, morning stiffness, myalgia, and low back pain. Dr. Agha continued her medications but switched her Restoral to Ambien (Tr. 395).

7

On October 28, 2008, Dr. Desai evaluated the plaintiff and indicated she had lost 24 pounds being on Prozac. Dr. Desai noted the medication change by Dr. Agha and switched the plaintiff's Prozac to Remeron (Tr. 572). The plaintiff followed up with Dr. Desai on November 26, 2008, complaining of continued problems with stress and loss of fun; Dr. Desai wrote that it was mainly related to her finances (Tr. 573).

On December 20, 2008. Dr. Desai indicated that the plaintiff was starting a new job and was "quite uptight and stressed out." The plaintiff reported extreme weight gain from Remeron and was switched back to Prozac. (Tr. 574). When she met with Dr. Desai on March 13, 2009, she reported that she was under a lot of stress as she was going through preparations for being a key witness in criminal pre-trial and civil proceedings (Tr. 576).

On April 3, 2009, Dr. Gamble evaluated the plaintiff for multiple symptoms including body aches. Dr. Gamble prescribed medication and ordered blood work (Tr. 860). On April 20, 2009, Dr. Agha indicated that the plaintiff complained of "pain all over." Dr. Agha added Noraco to her medications (Tr. 402).

On April 20, 2009, the plaintiff reported that she was very stressed about her inability to find a job. Dr. Desai indicated that the plaintiff was "quite somatic," and he refilled her medications (Tr. 577).

On April 28, 2009, Dr. Gamble evaluated the plaintiff and reviewed her treatment plans. The plaintiff complained of feeling "loopy" and "out of it" after her medications were changed. The plaintiff expressed concern regarding her memory, being tired, and taking so much medication. Dr. Gamble recommended that she continue treatment advised by Dr. Agha and Dr. Desai. He also advised a possible pain management consultation (Tr. 858).

On May 10, 2009, the plaintiff complained of worsening sleep problems and waking up in the night due to pain. Dr. Gamble advised the plaintiff to continue her current

8

medications and recommended a consultation with pain management (Tr. 857).  On June 12, 2009, Dr. Gamble evaluated the plaintiff for increased pain.  The plaintiff reported swelling in her knees and "popping" in her shoulders and complained of tiredness and rolling her ankles.  Dr. Gamble refilled and adjusted the plaintiff's medications (Tr. 856).

On July 6, 2009, Dr. Gamble evaluated the plaintiff for her multiple medical problems.  The plaintiff reported improved sleep.  Dr. Gamble advised continued treatment with Dr. Agha and pain management and he refilled her prescriptions for Paxil and trazodone (Tr. 854).  On August 7, 2009, the plaintiff complained of fibromyalgia pain and insomnia.  Dr. Gamble diagnosed fibromyalgia with chronic pain, insomnia, generalized anxiety disorder, fatigue, and chronic nasal congestion.  Dr. Gamble continued her current treatment regimen (Tr. 853).  On August 20, 2009, Dr. Agha evaluated the plaintiff for complaints of "pain all over" and reviewed and adjusted her medications (Tr. 416).

On September 16, 2009, the plaintiff visited Rebecca Holdren, M.D., of Pain Management Associates (Tr. 419-26).  She complained of lumbar pain, right ankle pain, and symptoms bilaterally in her elbows, hands, hips, and knees.  The plaintiff rated her lower lumbar pain at a 10/10; she said that she had taken several medications without relief (Tr. 419).  She complained of fatigue, malaise, night sweats, pain throughout her body, memory loss, inability to concentrate, numbness, tingling sensations, loss of sensation, depressive symptoms, insomnia, irritability, and increased stress, among other symptoms (Tr. 420).  On examination, Dr. Holdren noted that the plaintiff's mood and affect were appropriate; she displayed moderate tenderness in the lumbar area, with movement mildly restricted in all directions (Tr. 421).  Muscle spasms were noted in the plaintiff's low, middle, and upper back, but straight leg raise testing was negative (Tr. 422).  Her range of motion was normal in all major joints; she displayed 16/18 fibromyalgia tender points.  Dr. Holdren reviewed her lumbar MRI results and diagnosed degeneration of the intervertebral disc, myalgia and myositis, and long-term and current drug use.  Dr. Holdren reviewed her

9

narcotics policy with the plaintiff and indicated that she would take over all prescriptions of opioids for the plaintiff. Dr. Holdren gave her samples of Voltaren gel and Lidoderm patches and fibromyalgia education materials and exercise material (Tr. 419-24). The plaintiff participated in physical therapy from September 24, 2009, to December 22, 2009, per Dr. Holdren's orders (Tr. 453-557).

The plaintiff returned to Dr. Holdren on October 21, 2009, reporting no change in her pain. She had 13 out of 18 trigger points. Dr. Holdren refilled her prescription for Lortab and advised continued physical therapy. Her mood and affect were non-groggy and appropriate (Tr. 640-44). Also on October 21, 2009, the plaintiff was fitted for a lumbar back brace (Tr. 567). The plaintiff continued to be treated at Pain Management Associates on an approximately monthly basis throughout the relevant period (Tr. 644, 645-85, 722-44, 754-60, 764-816, 883-98, 904-59, 1008-12). [3]

On November 4, 2009, Dr. Desai noted that the plaintiff continued to have problems with depression and anxiety. The plaintiff said that she was unable to work because of her illness and the pain (Tr. 578). On November 18, 2009, Dr. Holdren reevaluated the plaintiff. Dr. Holdren noted that the plaintiff's activities included walking and therapy. The plaintiff's sleep was improving. Dr. Holdren continued the plaintiff's medications (Tr. 645-49).

On December 15, 2009, Dr. Gamble indicated that the plaintiff was "doing about the same." She was unable to get Lunesta but reported that Restoril was helping some. The plaintiff reported having more anxiety, depression, and mood swings and indicated that Paxil was not helping as much as it had before. Dr. Gamble refilled the plaintiff's medications and added Effexor (Tr. 849).

---

[3] The plaintiff was also seen by Robert Westrol, M.D., Ryan Rosen, M.D., Debbie Ellis, FNP-C, and Ryan Groth, PA-C (Tr. 644, 645-85, 722-44, 754-60, 764-816, 883-98, 904-59, 1008-12).

On December 16, 2009, Deborah Ellis, FNP-C, Dr. Holdren's nurse practitioner, evaluated the plaintiff. The plaintiff reported worsening back and hip pain. She was continuing with physical therapy and fibromyalgia program but reported no change in functional capacity. The plaintiff also reported that she had not gained any strength in her ankle and that her therapist advised her to ask Dr. Holdren about using a cane. The plaintiff was given an injection of Celestone Soluspan and prescribed Lortab and MS Contin. (Tr. 650-55).

In January 2010, the plaintiff indicated that she was doing light housework (Tr. 656). On January 28, 2010, Dr. Desai evaluated the plaintiff and indicated that she continued to be "depressed, somatic, and anxious." He indicated that the plaintiff seemed to be responding well to Effexor and advised her to gradually discontinue Paxil (Tr. 580).

On February 10, 2010, the plaintiff was fitted for a right ankle brace due to repeated ankle sprains and injuries (Tr. 563-66). She reported to Nurse Ellis that her activities included walking and light housework but reported falling a few times. She complained of severe left ankle pain (Tr. 662-67). On February 23, 2010, the plaintiff reported to Dr. Desai that her father wanted her to move out, which was causing her to be quite depressed. She also reported still feeling tired after she woke up. Dr. Desai refilled her prescriptions (Tr. 581). On March 10, 2010, the plaintiff saw Nurse Ellis and reported having a "really hard time" with her right hip, knee, and ankle. She indicated that her relief from Lortab was only lasting two hours and reported that her right ankle had given out that morning causing her to fall when she got out of the shower. Ms. Ellis gave the plaintiff an injection of Celestone Soluspan and switched her prescription for Lortab to MSIR (morphine) and prescribed MS Contin and baclofen (Tr. 668-73).

On March 22, 2010, the plaintiff reported to Dr. Desai that she was looking for a job and considering pursuing a criminal justice degree (Tr. 582).

11

On April 7, 2010, Ms. Ellis noted that the plaintiff listed her activities as walking and standing and listed current side effects of diarrhea and hot flashes. The plaintiff complained of total right-sided body pain. Ms. Ellis continued the plaintiff's medications (Tr. 674-79).

On May 5, 2010, Dr. Holdren evaluated the plaintiff. The plaintiff reported pain of 10 out of 10. Her prescriptions were refilled and Ambien was added (Tr. 680-85). On June 2, 2010, Kelly Scott, Dr. Holdren's nurse, evaluated the plaintiff. The plaintiff reported that her medications were working but were causing upset stomach. The plaintiff's medications were continued (Tr. 737-40). On June 30, 2010, Kathryn Lake, Dr. Holdren's nurse practitioner, evaluated the plaintiff. The plaintiff reported having severe hot flashes from the morphine. The plaintiff listed her activities as pool exercises and walking. Ms. Lake reviewed and adjusted the plaintiff's medications (Tr 732-36).

On July 5, 2010, Dr. Gamble evaluated the plaintiff for multiple symptoms including complaints of nausea and vomiting possibly due to her medications. He advised the plaintiff to continue with pain management and refilled her medications (Tr. 844). On July 16, 2010, the plaintiff continued to have right ear pain. Dr. Gamble adjusted her medications and advised an ENT consult (Tr. 838).

On July 7, 2010, Dr. Holdren reevaluated the plaintiff. The plaintiff reported bilateral arm pains, chest pain, frequent vomiting. She also reported that her pain medications were not working. Dr. Holdren noted that the plaintiff's pill counts were correct and that the plaintiff showed no aberrant behavior. Dr. Holdren discontinued the plaintiff's prescription for Fentanyl Patches and started her on MS Contin. Dr. Holdren also gave the plaintiff an injection of Toradol (Tr. 729-31).

On July 29, 2010, Dr. Desai evaluated the plaintiff. He noted that she was unable to tolerate Celexa because it caused worsened anxiety, nervousness, and insomnia. The plaintiff reported having a lot of dizziness and Dr. Desai indicated that this was

12

probably Meniere's disease.  Dr. Desai stopped Celexa and restarted the plaintiff on Effexor.  He also refilled her prescription for Xanax (Tr. 702).

On August 4, 2010, Ms. Ellis evaluated the plaintiff for complaints of dizziness and complaints that her medications not working.  The plaintiff listed her activities as walking and showed no signs of over-sedation. The plaintiff's medications were continued. (Tr. 726-28).

On August 9, 2010, Dr. Gamble evaluated the plaintiff for dizziness and tinnitus.  The plaintiff was advised to follow-up with her ENT (Tr. 837).  On August 30, 2010, the plaintiff underwent videonystagmography ("VNG")(a technology for testing inner ear and central motor functions) for complaints of a constant sense of low grade vertigo that had developed a few months prior with medication change (Tr. 711-22).

On September 1, 2010, the plaintiff met with Nurse Ellis, identified her activities as walking, and stated that her medications were working well.  She showed no evidence of oversedation (Tr. 722).  In October 2010, the plaintiff reported that her depression was better, she wanted to discontinue valium because it made her drowsy and unable to focus (Tr. 967).

On November 10, 2010, Dr. Gamble noted that the plaintiff's pain medications were not helping and that pain management had changed her medications.  The plaintiff reported concern over addiction to narcotics.  Dr. Gamble recommended continued treatment with pain management and prescribed Lunesta (Tr. 833).

On November 24, 2010, Dr. Holdren evaluated the plaintiff and reviewed her medications.  She reported having dizziness from oxycodone.  Dr. Holdren noted that the plaintiff's pain behaviors were within the expected context of her disease and she was using her medications as prescribed.  Dr. Holdren switched her oxycodone to metaxalone (Tr. 807-810).

13

On December 23, 2010, Dr. Desai evaluated the plaintiff.  She reported taking new medication for vertigo and that her neurologist thought that her headaches had caused the vertigo.  The plaintiff again reported her frustration at being unable to find a job despite applying for many (Tr. 966).

On January 5, 2011, Dr. Holdren evaluated the plaintiff.  The plaintiff reported that her insurance would not cover the requested MRI or physical therapy.  The plaintiff listed her activities as walking and minor exercises.  Dr. Holdren indicated that the MRI was a medical necessity.  Dr. Holdren indicated that she would give the plaintiff Celestone injections in the future and prescribed Robaxin and oxycodone (Tr. 803-06).

On February 2, 2011, Ryan Groth, PA-C, Dr. Holdren's physician's assistant, evaluated the plaintiff for continued pain.  The plaintiff reported her pain at ten out of ten without medication and seven out of ten with her medications.  Mr. Groth continued the plaintiff's medications and referred her to Dr. Westrol for possible hip and hand injections (Tr. 797-801).  On February 4, 2011, Dr. Gamble evaluated the plaintiff for follow-up of her sleep problems.  The plaintiff reported only sleeping four to five hours at night.  Her current treatment regimen was continued (Tr. 829).  On February 23, 2011, Robert Westrol, M.D., evaluated the plaintiff at Dr. Holdren's request.  The plaintiff reported a long history of chronic pain.  Dr. Westrol indicated that lumbar facet provocation maneuvers were positive on the right and Tinel's sign was positive at both carpal tunnels.  Dr. Westrol diagnosed degeneration of intervertebral disc, low back pain, myalgia and myositis, scoliosis, long-term drug use, lumbar arthritis/spondylosis, and piriformis syndrome/lesion of sciatic nerve.  Dr. Westrol ordered an MRI and bone scan and prescribed Naproxen (Tr. 793-96).

On March 3, 2011, the plaintiff had a lumbar MRI that showed mild scoliosis (Tr. 753).  On March 4, 2011, the plaintiff had a whole body scan that showed right convex curvature of the spine with mild uptake in a degenerative pattern in the posterior facets (Tr. 761).  On March 23, 2011, Dr. Westrol reevaluated the plaintiff.  She reported severe neck

14

and back pain with numbness, tingling, and burning. The plaintiff reported that her pain was worsened with walking and being too still, and relieved with massage and pain medications. Dr. Westrol indicated that lumbar facet provocation maneuvers and sacroiliac provocation maneuvers were both positive bilaterally and that the plaintiff had generalized tenderness to palpation throughout her lumbar area. Dr. Westrol reviewed the plaintiff's diagnostic studies and they discussed and planned injection therapy (Tr. 784-86). On March 24, 2011, Dr. Desai evaluated the plaintiff and noted various life stresses. She reported trying to cut down on her dose of Oxycontin. Dr. Desai prescribed a decreased dose of Xanax (Tr. 965). On March 30, 2011, Mr. Groth evaluated the plaintiff for constant pain. The plaintiff reported being able to achieve walking and minor lifting. She also reported that her medications were not as effective as they had been previously. The plaintiff's oxycodone was increased to three times per day (Tr. 778-83).

In April 2011, the plaintiff complained of anxiety and some depression; she was concerned about an upcoming operation on her spine where her nerves would be cut so that she would no longer feel the pain (Tr. 827, 965). The plaintiff underwent a lumbar radiofrequency ablation of the right L3, L4, and L5 medial branches on April 26, 2011. Her pain at the beginning of the procedure was rated at a 10/10, and after the procedure, she rated her pain at a 0/10 (Tr. 773-74). On April 28, 2011, the plaintiff reported that she had experienced an 80% pain relief from an ablation procedure performed on her right side. Mr. Groth evaluated the plaintiff and discussed treatment options. He noted that the plaintiff was psychologically unstable and therefore was unable to have a ketamine infusion. The plaintiff's current medications were continued (Tr. 766-72). The plaintiff underwent a lumbar radiofrequency ablation of the left L3, L4, and L5 medial branches on May 6, 2011. Her pain was rated at a 9/10 before the procedure, but after the operation, her pain was rated at a 0/10 (Tr. 764-65).

15

On May 26, 2011, the plaintiff was reevaluated by Mr. Groth for complaints of pain in her low back, knees, and ankles. The plaintiff reported pain of 10/10 without her medications and 7/10 with her medications. Mr. Groth noted that the plaintiff's scoliosis, myalgia, and myositis were "stable." He noted that the plaintiff's long-term drug use was unstable and adjusted her medications (Tr. 755-60). A note at Pain Management Associates indicated that the practice would continue the plan established after the plaintiff's original physical examination; she was receiving adequate pain relief and was tolerating side effects well. She was satisfied with her activities of daily living (Tr. 754).

However, in June 2011, the plaintiff was still struggling with back pain and she reported gaining more weight (Tr. 964). On June 17, 2011, Dr. Westrol evaluated the plaintiff for moderate to severe back pain and bilateral hand pain. She complained that her pain was affecting her "quality of living." She reported 100% pain relief from the ablations, but she had started experiencing pains radiating down her sciatic nerve. Dr. Westrol discussed and scheduled injections (Tr. 951-53). On June 23, 2011, Mr. Groth evaluated the plaintiff. She reported that her pain was 10/10 with or without medication. Mr. Groth increased her Fentanyl and continued her other medications (Tr. 943-50). On June 29, 2011, the plaintiff received a right piriformis muscle injection (Tr. 942). On June 30, 2011, Mr. Groth evaluated the plaintiff for stabbing and aching pain. The plaintiff asked for medication alternatives because her insurance denied Fentanyl patches. Mr. Groth prescribed morphine in place of Fentanyl patches (Tr. 934-41).

On July 6, 2011, the plaintiff received bilateral sacroiliac joint injections (Tr. 932). On July 11, 2011, Dr. Gamble evaluated the plaintiff. He noted that the plaintiff had applied for disability because she could not find a job when her health problems were discovered (Tr. 825). On July 13, 2011, the plaintiff received a right greater trochanter injection in her hip (Tr. 933). On July 14, 2011, Dr. Desai reevaluated the plaintiff. She complained of continued physical pain and reported that pain management had changed

16

her medications, but the change was still not controlling her pain.  She indicated that she was having anxiety and nervousness from her pain.  Dr. Desai continued the plaintiff's medications (Tr. 964).

On July 27, 2011, the plaintiff received a left sacroiliac joint injection, and, on August 5, 2011, she received a right sacroiliac joint injection (Tr. 922, 923).

In August and September 2011, the plaintiff complained of anxiety and depression due to pain and lack of sleep, but she reported that Prozac helped with the depression and Buspar helped with the anxiety (Tr. 963).  On August 23, 2011, Mr. Groth evaluated the plaintiff for medication refills.  The plaintiff reported that her pain was 10/10 even with medication and that she was "able to achieve very little walking."  The plaintiff complained of pain in her shoulders, buttocks, wrists, hips, and knees. She indicated that her medications were not strong enough.  Mr. Groth continued the plaintiff's medications and added Zonegran.  Mr. Groth indicated that they could not increase opiates without the plaintiff going to physical therapy (Tr. 913-20).

On September 16, 2011, Dr. Westrol evaluated the plaintiff.  She described her pain as sharp, radiating, pulling, and stretching.  The plaintiff indicated that nothing was relieving her pain.  Dr. Westrol indicated that lumbar facet provocation maneuvers and sacroiliac provocation maneuvers were both positive bilaterally, and the plaintiff had tenderness to palpation over her bilateral lumbar paraspinals.  Dr. Westrol referred the plaintiff to Dr. Rosen for a musculoskeletal program (Tr. 910-12).  On September 19, 2011, the plaintiff had x-rays of her cervical, thoracic, and lumbar spines, which showed a right convex curvature of the thoracolumbar spine measuring 34 degrees (Tr. 899).  Dr. Rosen evaluated the plaintiff for lower back pain and bilateral hand pain.  The plaintiff rated her pain as 10/10.  Dr. Rosen recommended that the plaintiff participate in a rehabilitation program (Tr. 907-09).  On September 21, 2011, Dr. Holdren evaluated the plaintiff.  She reported her normal activities and indicated that her medications were not working.  The

plaintiff's gait was antalgic, and her posture was altered due to a forward flexed body posture. Dr. Holdren indicated that they would taper the plaintiff off of opiates and increase her dose of Zonegran. Dr. Holdren deferred the plaintiff's handicap placard request to Dr. Rosen and indicated that the plaintiff would need to have a work assessment to determine disability questions (Tr. 883-87). The plaintiff participated in rehabilitation therapy including spinal manipulation and passive modalities from September 30 to October 7, 2011 (Tr. 891-98)

On October 10, 2011, Dr. Desai reevaluated the plaintiff. He noted that she was not doing well physically. The plaintiff reported going through physical therapy, which worsened her pain, and falling on a rainy day, injuring her back even more. Dr. Desai refilled her prescriptions and increased her dose of trazodone (Tr. 963). On October 11, 2011, Dr. Rosen evaluated the plaintiff at Dr. Westrol's request. The plaintiff indicated that rehabilitation had not helped her at all. She reported recently falling and rated her pain as ten out of ten. Dr. Rosen noted that the plaintiff had a recent fall with knee pain and some mild suprapatella bursa fluid. He encouraged the plaintiff to continue with active rehabilitation sessions and her home exercise program (Tr. 888-90).

In November 2011, the plaintiff failed a course of active rehabilitation after five visits (Tr. 905-906, 955). On November 9, 2011, Dr. Rosen cancelled the plaintiff's additional rehabilitation sessions and advised her to follow up with Dr. Holdren (Tr. 904-06). On November 23, 2011, Dr. Holdren evaluated the plaintiff. The plaintiff reported that Zonegran was not helpful and caused her to have hallucinations and sleepiness unless she only took it at night. Dr. Holdren indicated that the plaintiff had the same pain areas but had not had any falls or accidents. The plaintiff's activities included limited walking. Dr. Holdren noted that active rehabilitation had been discontinued due to increased pain. Dr. Holdren stated that it was "OK" for a handicap placard "at this time." Dr. Holdren's plan included tapering off opiates and increasing Zonegran. Dr. Holdren deferred the handicap placard

18

transfer and disability form to Dr. Rosen and stated, "but note that patient has not worked in many years and declared 20% disabled from WRI for her back" (Tr. 955-59).

On December 16, 2011, Dr. Desai reevaluated the plaintiff. The plaintiff complained of severe pain. She reported being in the ER for a fractured nose and busted lip. Dr. Desai refilled the plaintiff's prescription for Xanax (Tr. 962). On February 2, 2012, Dr. Desai indicated that the plaintiff was sleeping only three hours a night. Dr. Desai reviewed and refilled her medications including Xanax, trazodone, Prozac, and Buspar (Tr. 961).

### State Agency Medical Opinions

On October 20, 2009, state agency consulting psychologist Debra Price, Ph.D., reviewed the record and opined that the plaintiff's mental impairments were not severe (Tr. 431-44). Dr. Price opined that the plaintiff's depression was a medically determinable impairment that caused mild restrictions in activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace (Tr. 443, 441). Dr. Price noted that the plaintiff's alleged symptoms were not credible as she cared for her daughter, took her to school, performed some cleaning and cooking, and read, watched television, and looked for work on a daily basis (Tr. 443).

On October 20, 2009, state agency consulting physician Seham El-Ibiary, M.D., reviewed the record and provided an opinion regarding the plaintiff's physical functional capacity (Tr. 445-52). Dr. El-Ibiary opined that the plaintiff could occasionally lift twenty pounds, could frequently lift ten pounds; could stand and/or walk about six hours in an eight-hour workday; and could sit for about six hours in an eight-hour workday. Dr. El-Ibiary noted that the plaintiff attended a pain management center for mild degenerative changes in her back, mild scoliosis per MRI, and fibromyalgia (Tr. 446). Dr. El-Ibiary considered the plaintiff's reports of restricted activities of daily living due to chronic pain and

reduced her functional capacity to light work (Tr. 446). Dr. El-Ibiary also opined that the plaintiff could occasionally stoop, crawl, and climb ladders, ropes, or scaffolds, and could frequently balance, kneel, crouch, and climb ramps or stairs (Tr. 447). She would need to avoid exposure to hazards due to her impaired gait (Tr. 449). Dr. El-Ibiary opined that the plaintiff's alleged symptoms appeared most credible with the evidence, though her pain behaviors might be more severe than the findings (Tr. 450).

On July 27, 2010, state agency consulting psychologist Craig Horn, Ph.D., reviewed the record and opined that the plaintiff's depression and anxiety were nonsevere impairments (Tr. 686, 689, 691). He opined that the plaintiff's mental impairments did not limit her activities of daily living or her ability to maintain social functioning, but that they did produce mild difficulties in maintaining concentration, persistence, or pace (Tr. 696). Dr. Horn referred to treatment notes from Dr. Desai and noted that there was no evidence or allegation that her mental condition had worsened (Tr. 698). Dr. Horn noted that the plaintiff reported in March 2010 that she was still looking for work and that she had considered returning to school (Tr. 698).

State agency consulting physician Frank Ferrell, M.D., reviewed the record and provided an opinion regarding the plaintiff's functional limitations on August 5, 2010 (Tr. 710). Dr. Ferrell opined that the plaintiff could occasionally lift up to twenty pounds; could frequently lift ten pounds; could stand and/or walk about six hours in an eight-hour workday; and could sit for about six hours in an eight-hour workday. Dr. Ferrell noted that evidence from the plaintiff's pain management specialist indicated that her pain was controlled; her neuromuscular functions were preserved; the plaintiff walked for exercise, and she continued to search for a job (Tr. 704). He opined that the plaintiff could never climb ladders, ropes, or scaffolds, and that she needed to avoid concentrated exposure to hazards due to her daily use of narcotic pain medication (Tr. 705, 707).

20

***Medical Source Statements***

On February 9, 2010, Dr. Holdren completed a worksheet opinion rating the plaintiff's abilities to sustain a variety of activities during an eight-hour day (Tr. 558-59, 745-46). Dr. Holdren opined that the plaintiff could lift no more than ten pounds at a time and could stand or walk for no more than two hours in an eight-hour day; she could sit for about six hours in an eight-hour day. Further, the plaintiff would be limited to moving her hands and arms suspended above a table for 20% of an eight-hour day; she could not push and pull leg or foot controls more than 20% of an eight-hour day; and she would need to elevate her legs at or above the waist for approximately 10% of an eight-hour day (Tr. 558). Dr. Holdren indicated that two questions regarding the link between the plaintiff's pain and emotional distress were not applicable. She opined that the plaintiff's pain would be increased for seven days a week, or thirty days per month. She opined that the plaintiff's pain or psychological issues would prohibit her from performing tasks that required abstract thought, more than one or two steps, or basic attention to task, for approximately 60% of a typical workday. In a space on the worksheet that asked Dr. Holdren to identify the diagnoses, clinical, and laboratory findings supporting her opinions, she wrote "12-22-09" and referred to her discharge from a treatment program without most of her goals being met (Tr. 559).

On September 29, 2010, Dr. Desai completed a worksheet opinion providing an opinion regarding the plaintiff's functional limitations (Tr. 745-46). Dr. Desai opined that the plaintiff could function satisfactorily for only 20% of an eight-hour workday in dealing with the public, interacting with supervisors, dealing with ordinary work stress, and functioning independently. Dr. Desai opined that the plaintiff could function satisfactorily for 40% of the workday in following work rules, using judgment, and maintaining attention and concentration, and that she could function satisfactorily for 60% of the workday in relating to coworkers. Asked to identify the medical and clinical findings supporting the

opinions, Dr. Desai noted that the plaintiff was extremely anxious and she stayed depressed.  Dr. Desai further opined that the plaintiff could function satisfactorily for 20% of an eight-hour workday at understanding, remembering, and carrying out detailed job instructions, behaving in an emotionally stable manner, and relating predictably in social situations.  The plaintiff could function satisfactorily for 40% of an eight-hour workday at understanding, remembering, and carrying out complex job instructions, maintaining personal appearance, and demonstrating reliability; and she could function satisfactorily for 60% of an eight-hour workday at understanding, remembering, and carrying out simple job instructions.    Dr. Desai noted that the plaintiff had poor concentration, limited comprehension, and poor tolerance for frustration (Tr. 745-46).

On November 1, 2011, Dr. Holdren responded to a questionnaire regarding the plaintiff.  Dr. Holdren opined that the plaintiff would probably have to rest away from her work station for significantly more than an hour during an eight-hour workday; she would probably miss more than three days of work per month; and she would have problems with attention and concentration that would frequently interrupt her tasks during the workday. Dr. Holdren identified the diagnoses underlying her opinions as scoliosis, degenerative changes to the lumbar spine, piriformis syndrome, and facet syndrome. Dr. Holdren further noted that the plaintiff had made poor progress in pain management despite having been treated by her clinic for over a year (Tr. 903).

***Administrative Hearing Testimony***

The plaintiff testified that she graduated from high school; she last worked for pay in September 2008.  At that time, she was running an office for a construction company; she hired and fired people, and she supervised between five and twenty-five people (Tr. 68-69). Her duties included completing payroll, scheduling, dealing with clients, and tracking inventory (Tr. 69).  She had to lift approximately fifty-pound buckets of screws on a daily basis.  The plaintiff was let go from the job after she discovered that the owner of the

22

company was embezzling money from one of the partners; she turned him in, and he said that she was not completing her duties. The plaintiff stated that she was not physically capable of performing that job because of the lifting required. If the lifting aspect of the job was removed, the plaintiff stated that she would still need help with the inventory (Tr. 70-71). The plaintiff stated that she could not perform a basic clerical job because she cannot sit for long periods of time without needing to stand up and move around.

The plaintiff also stated that she had been looking for work since her job ended; she had applied for cashier positions, secretarial jobs, and administrative positions (Tr. 71). She thought she had the physical capacity to perform those jobs, but only on a part-time basis because she could not sit comfortably for more than thirty minutes (Tr. 71, 81). The plaintiff stated that she had pain in her lower back, shoulders, and neck (Tr. 72). The plaintiff stated that she had scoliosis and that it prevented her from sitting up straight or standing up straight. She also had difficulty walking because her hips were off-center, and she had problems with her shoulders locking-up, but she was unsure why (Tr. 73-74). The plaintiff testified that she had received trigger point injections for her pain and that they had helped for three to four days, but then the relief wore off. The plaintiff took Zonegran for her pain, but she was unsure whether it helped because it made her sleepy and she was unsure how she felt while she was asleep (Tr. 75-76).

The plaintiff stated that she was depressed because she felt like she was letting her child down by not finding a job and taking care of her. The depression was impacting her life because she did not have friends and did not have a chance to socialize (Tr. 77). She stated that during the day she sat at home and cried for a lot of the day (Tr. 78). The plaintiff testified that her anxiety resulted from having bills to pay and a child to care for and no financial means of doing so. Her anxiety caused her to get very mad at small things – she said she had a very short fuse when she was stressed (Tr. 82-83). The plaintiff stated that she could care for her personal hygiene but needed help washing her

23

hair; she did laundry if the pile of clothes was not too heavy, and she swept the floors  (Tr. 78-79).  She could stand in a line for thirty minutes (Tr. 82).  The plaintiff stated that she read an average of five books per week and that she did not have any problems doing so – it helped keep her mind focused (Tr. 83).  The plaintiff testified that she could retain the information that she read, and she could describe the plot of the book she was reading (Tr. 84).  The plaintiff stated she was able to drive and only had problems if her back was "pinched" (Tr. 86).

The plaintiff received unemployment benefits in 2009, 2010, and 2011 (Tr. 85-86).  She walked for exercise approximately ten minutes at a time (Tr. 87).

## ANALYSIS

The plaintiff was 33 years old on the alleged disability date and 37 on the date of the ALJ's decision.  She completed high school and has past relevant work experience as an administrative assistant and as an assistant manager.  The  plaintiff argues the ALJ erred by: (1) failing to properly evaluate her mental impairments, (2) failing to include her mental impairments in combination with her physical impairments in the residual functional capacity ("RFC") assessment, and (3) failing to properly evaluate the demands of her past relevant work.

### *Mental Impairments*

The plaintiff argues that the ALJ erred in finding that her anxiety and depression were not severe impairments (pl. brief at 26-30).  A severe impairment is one which significantly limits an individual's ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Impairments having only a minimal effect on basic work activities are not severe. *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984).  The plaintiff contends that the ALJ's determination that her mental impairments are not severe lacks substantial evidentiary support because the ALJ erroneously relied on the outdated opinions of state agency reviewing psychologists (pl. brief at 29-30).

24

The plaintiff cites evidence from her treating pain specialist and treating psychiatrist in support of her contention that her mental impairments caused her "fairly significant problems" (*id.* at 26-30). However, the undersigned finds that substantial evidence supports the ALJ's reliance on the opinions of the state agency reviewing psychologists in finding that her mental impairments are not severe (Tr. 19-20).

In assessing the severity of mental impairments, agency fact-finders must follow a prescribed psychiatric review technique, making findings of fact on four specific criteria, commonly referred to as the "paragraph B" criteria. *See* 20 C.F.R. §§ 404.1520a, 416.920a. The four criteria are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. *See* 20 C.F.R. § 404.1520a(c)(3). The fact-finder must rate the claimant's degree of limitation in each of the four categories. *Id.* at § 404.1520a(c)(4). The governing regulation explains that when the fact-finder rates the claimant's degree of limitation as "none" or "mild" in the first three categories, and as "none" on the fourth category, the fact-finder should generally conclude that the mental impairments are non-severe. *Id.* at § 404.1520a(d)(1). In this case, the ALJ cited substantial evidence, including the opinions of the reviewing psychological experts, in finding that the plaintiff's mental impairments imposed no more than mild limitations in her activities of daily living; no more than mild limitations in her social functioning; no more than mild limitations in her concentration, persistence, or pace; and she had experienced no episodes of decompensation (Tr. 19-20).

In finding that the plaintiff had no more than mild limitations in her activities of daily living, the ALJ emphasized that the plaintiff read approximately five novels per week; she went to the library; she took her daughter hunting; she drove; she took her daughter to and from appointments; she helped her daughter with homework; she cooked for her daughter; she cared for pets; she shopped; and she managed her personal finances (Tr. 19; *see* Tr. 83, 244-248). The ALJ also pointed out that the plaintiff reported in May

2011 that she was satisfied with her activities of daily living (Tr. 19; *see* Tr. 754). Further, the ALJ relied (Tr. 19) on the opinions of state agency reviewing psychologist Dr. Price, who opined that the plaintiff's mental impairments posed only mild limitations in her activities of daily living (Tr. 441, 443), and state agency reviewing psychologist Dr. Horn, who opined that the plaintiff's mental impairments produced no limitation in her activities of daily living (Tr. 696, 698).

The ALJ also identified substantial evidence to support his finding that the plaintiff had no more than mild limitations in her social functioning (Tr. 19-20, 25-26). The ALJ cited the plaintiff's activities that showed an ability to socially interact with others; she shopped, spent time with others, went hunting with her daughter and neighbor, and looked for office work (Tr. 19; *see* Tr. 79, 247-48, 582). Additionally, the ALJ relied on the opinions of Dr. Price and Dr. Horn, both of whom opined that the plaintiff had no difficulties in social functioning (Tr. 441, 698).

The ALJ also identified substantial evidence to support his finding that the plaintiff was no more than mildly limited in concentration, persistence, or pace (Tr. 19-20). As the ALJ explained, the plaintiff testified that she read approximately five novels per week without any difficulties in maintaining attention or retaining information (Tr. 83-84); treatment notes showed that she was looking for office work (Tr. 582); and examinations showed normal memory (Tr. 585). Further, Dr. Horn and Dr. Price agreed that the plaintiff had mild limitations in concentration, persistence, or pace (Tr. 441, 698). The ALJ also emphasized that the plaintiff's ability to care for her daughter, care for her pets, shop, manage personal finances, and drive a car evinced an ability to maintain concentration, persistence, or pace (Tr. 19).

The plaintiff takes issue with the ALJ's reliance on the opinions of Dr. Price and Dr. Horn, arguing that the opinions were outdated since there was evidence added to the record after the psychologists reviewed the record (pl. brief at 29). The plaintiff argues

26

that the ALJ should have given greater weight to the opinions of Dr. Holdren and Dr. Desai, both of whom opined that she had substantially greater mental limitations than the ALJ found (*id.* at 29-30).

However, the ALJ gave good reasons, supported by substantial evidence, for rejecting the opinions of Dr. Holdren and Dr. Desai.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the examining relationship; (2)  the length of the treatment relationship and the frequency of the examinations; (3)   the nature and extent of the treatment relationship; (4)   the evidence with which the physician supports his opinion; (5)   the consistency of the opinion; and (6)  whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.   These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the

> opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The ALJ acknowledged Dr. Holdren's opinion that the plaintiff could not maintain attention during the day but gave the opinion little weight (Tr. 25; *see* Tr. 559). As the ALJ explained, Dr. Holdren's opinions were not consistent with the record - most notably, the plaintiff's testimony that she read approximately five novels per week, in addition to caring for her young daughter and carrying out her own daily activities.  The ALJ also noted that the plaintiff was able to give detailed testimony throughout the hearing, and she reported that she was considering pursuing a criminal justice degree in March 2010 (Tr. 25).  The ALJ reasonably considered this evidence to be inconsistent with allegations of a significant limitation in concentration.  Also, as noted by the Commissioner, Dr. Holdren's opinion consists of a check-marked worksheet with almost no explanation for the opinions (Tr. 558-59).  When asked to provide the diagnoses and clinical and laboratory findings underlying her opined limitations, Dr. Holdren wrote only "12-22-09," presumably referring to the plaintiff's discharge from an outpatient fibromyalgia treatment program that day (Tr. 548-57, 558-59).   The discharge note makes no mention of decreased attention, concentration, or pace, and actually describes the plaintiff's current level of functioning as "high, tries to stay very active" (Tr. 548).

The ALJ also acknowledged Dr. Desai's opinion that the plaintiff could function satisfactorily for only 20% of an eight-hour workday in dealing with the public, interacting with supervisors, dealing with ordinary work stress, and functioning independently; could function satisfactorily for 40% of the workday in following work rules, using judgment, and

maintaining attention and concentration; could function satisfactorily for 60% of the workday in relating to coworkers; could function satisfactorily for 20% of an eight-hour workday at understanding, remembering, and carrying out detailed job instructions, behaving in an emotionally stable manner, and relating predictably in social situations; could function satisfactorily for 40% of an eight-hour workday at understanding, remembering, and carrying out complex job instructions, maintaining personal appearance, and demonstrating reliability; and could function satisfactorily for 60% of an eight-hour workday at understanding, remembering, and carrying out simple job instructions(Tr. 25; *see* Tr. 745-46).

The ALJ gave little weight to Dr. Desai's opinion, concluding that Dr. Desai's opinion was inconsistent with her own treatment notes, the plaintiff's extensive activities, and the opinions of the state agency reviewing psychologists (Tr. 19-20, 25).  As the ALJ pointed out, the plaintiff's mood and affect were consistently described as appropriate by her treating sources (Tr. 25; *see* Tr. 585, 642, 723, 727, 730, 758, 815).  Moreover, Dr. Desai indicated that the plaintiff had "no depression" in December 2010 (Tr. 966), only three months after Dr. Desai issued her severely limiting opinion, and in May 2011, Dr. Desai noted that the plaintiff was mentally stable (Tr. 964). The ALJ also emphasized the plaintiff's activities that were inconsistent with the allegedly disabling mental limitations (Tr. 19-20, 25).

The undersigned finds that substantial evidence supports the ALJ's decision to give greater weight to the opinions of the state agency psychologists Drs. Price and Horn (Tr. 24-26).  Here, Dr. Horn viewed records from the plaintiff's treating psychiatrist, Dr. Desai, and considered them in assessing the plaintiff's mental limitations (Tr. 568-82, 698). As both Dr. Horn and the ALJ noted, the plaintiff told Dr. Desai in March 22, 2010, that she was still looking for a job and was thinking about going back to school (Tr. 25, 698; *see* Tr. 582).  In January 2011, she was still looking for a job (Tr. 966).  This court has previously

held that a plaintiff's "pursuit of employment is completely inconsistent with her claim of disability." *Dean v. Astrue*, 9:06-cv-3431-GRA-GCK, 2008 WL 373624, at *19 (D.S.C. Feb. 8, 2008). While the plaintiff argues that the opinions of Drs. Price and Horn should not be accorded significant weight because their opinions "were based on an incomplete record" (pl. brief at 29), she does not point to evidence the state agency psychologists did not consider that would have changed their opinions. Moreover, an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012). Here, the ALJ considered the entire record, and substantial evidence supports his determination to give significant weight to the opinions of Drs. Price and Horn that the plaintiff's mental impairments were not severe (Tr. 19-20, 24). *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."). While a reasonable fact-finder might have reached a different conclusion, since substantial evidence supports the ALJ's finding, this court should not disturb it.

**Combined Impairments**

The plaintiff next argues that the ALJ failed to consider the combined effect of all her impairments (pl. brief at 30-31). When, as here, a claimant has more than one

impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability.  Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).  The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

The ALJ's decision in this case demonstrates that he reasonably considered the combined effects of the plaintiff's impairments, as he stated several times that he considered the entire record/all of the evidence (Tr. 15, 17, 20, 21), and he specifically indicated that he considered the combined effects of the plaintiff's impairments (Tr. 20). *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (taking the ALJ at his word when he stated that he considered all of the claimant's impairments in combination).

The ALJ's findings and analysis further establish that he considered the plaintiff's impairments in combination. At step two, the ALJ found that the plaintiff had a "severe combination of multiple impairments" in that her "combination of impairments cause[d] significant limitations in [her] ability to perform basic work activities" (Tr. 18).  The ALJ then proceeded to discuss those impairments, both severe and nonsevere (Tr. 17-20). The ALJ devoted significant attention to discussing impairments that the plaintiff never even alleged contributed to her disability (Tr. 17-20; *see* Tr. 227).  For example, the ALJ found that the plaintiff had a history of right carpal tunnel syndrome and that recent diagnostic imaging had described her wrist as demonstrating "mild negative ulnar variances in the right

31

wrist." The ALJ found that the impairment was not severe because she did not allege it is a basis for disability; made no mention of the condition during her testimony; and objective examinations generally showed normal extremity strength, sensation, or motion (Tr. 18). The ALJ also discussed in detail other conditions that the plaintiff did not allege to be disabling, such as gastroesophageal reflex disease, gastric ulcer, gastritis, hiatal hernia, irritable bowels, and ganglion cyst on the right elbow (Tr. 18-19).

Next, at step three, the ALJ considered whether the combined effects of the plaintiff's impairments met or medically equaled one of the listed impairments (Tr. 20). Then, "after careful consideration of the entire record," the ALJ held that the plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b), except that she was additionally limited to frequent balancing, kneeling, crouching, and climbing of ramps and stairs; occasional crawling and stooping; no climbing of ladders, ropes, or scaffolds; and avoidance of concentrated exposure to hazards (Tr. 20-21).

Courts in this district have found the ALJ's discussion and analysis adequate where a reading of the decision as a whole makes clear that the ALJ considered the combination of impairments (Tr. 14-21). *See, e.g., Simmons v. Astrue*, No. 9:11-02729-CMC-BM, 2013 WL 530471, at *5 n.7 (D.S.C. Feb. 11, 2013) (stating "when considering whether the ALJ properly considered the combined effects of impairments, the decision must be read as a whole"); *Glockner v. Astrue*, No. 0:11-955-CMC-PJG, 2012 WL 4092618, at *4 (D.S.C. Sept. 17, 2012) (finding "that the ALJ sufficiently discussed Plaintiff's alleged impairments and limitations to demonstrate that he considered Plaintiff's impairments in combination"). Furthermore, the plaintiff has not alleged, much less established, that the combined effects of her impairments would satisfy any specific listing. *See Kellough v. Heckler*, 785 F.2d 1147, 1152 (4th Cir.1986) (noting that it is a plaintiff's burden to present evidence that her condition meets or equals a listed impairment). While the plaintiff argues that the ALJ's failure to properly evaluate her mental impairments

32

resulted in an improper RFC determination, as discussed above, the undersigned finds that the ALJ adequately considered the plaintiff's mental impairments and supported his findings with substantial evidence. In making his RFC finding, the ALJ specifically noted that he found "no related limitations" with regard to the plaintiff's depression and anxiety (Tr. 23). Based upon the foregoing, the undersigned finds that, considering the decision as a whole, the ALJ adequately considered the combined effect of the plaintiff's impairments.

**Past Relevant Work**

At the fourth step of the disability inquiry, a claimant will be found "not disabled" if the claimant is capable of performing his or her past relevant work either as he or she performed it in the past or as it is generally required by employers in the national economy. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). The claimant bears the burden of establishing that he or she is incapable of performing his or her past relevant work. *See DeLoatche v. Heckler*, 715 F.2d 148, 151 (4th Cir. 1983) (noting that a plaintiff must demonstrate an inability to return to her past occupation, not merely an inability to return to her "specific prior job").

Social Security Ruling 00-4p explains that the Social Security Administration relies "primarily on the [*Dictionary of Occupational Titles* ("*DOT*")] (including its companion publication, the [*Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*]) for information about the requirements of work in the national economy." *See* SSR 00-4p, 2000 WL 1898704, at *2. Social Security Ruling 82-61 explains that the *DOT* descriptions of jobs "can be relied upon … to define the job as it is *usually* performed in the national economy." *See* SSR 82-61, 1982 WL 31387, at *2 (emphasis in original).

The ALJ found that the plaintiff could perform her past relevant work, noting that while the plaintiff referred to the job as that of an administrative assistant, the job description more closely mirrored that of an administrative clerk as defined by the *DOT* (Tr.

33

26-27).  The plaintiff argues that the ALJ erred in this finding because he did not resolve "inconsistencies" between her job as she actually performed it and the job of administrative clerk (pl. brief at 24-26).

The plaintiff first emphasizes that her work required lifting of up to 50 pounds and that the administrative clerk position identified by the ALJ did not require lifting of up to 50 pounds.  However, the ALJ found that the plaintiff could perform the job of administrative clerk as it "is generally performed" (Tr. 27).  As stated in Social Security Ruling 82-61:

> It is understood that some jobs will require somewhat more or less exertion than the *DOT* description.  A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy.  Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

1982 WL 31387, at *2.

The ALJ reasonably considered the plaintiff's description of her past relevant work and then evaluated her job duties against the job of administrative clerk as described in the *DOT*.  The plaintiff reported that she answered phones, completed project bids, searched for project leads, followed up on project bids, fixed computers when problems arose, processed payroll for the accountant, wrote checks, and paid bills (Tr. 219).  The *DOT* describes the job duties of an administrative clerk as:

> Compiles and maintains records of business transactions and office activities of establishment, performing variety of following or similar clerical duties and utilizing knowledge of systems or procedures: Copies data and compiles records and reports.  Tabulates and posts data in record books. Computes wages, taxes, premiums, commissions, and payments. Records orders for merchandise or service. Gives information to and interviews customers, claimants, employees, and sales personnel.  Receives, counts, and pays out cash. Prepares, issues, and sends out receipts, bills, policies, invoices, statements, and

34

> checks. Prepares stock inventory. Adjusts complaints. Operates office machines, such as typewriter, adding, calculating, and duplicating machines. Opens and routes incoming mail, answers correspondence, and prepares outgoing mail. May take dictation. May greet and assist visitors. May prepare payroll. May keep books. May purchase supplies. May operate computer terminal to input and retrieve data.

DOT 219.362-010, 1991 WL 671953. The administrative clerk position has a "reasoning level" of 4 ("R4"), requiring an employee to "[a]pply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists. Interpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form. . . ." *Id.* The plaintiff reported that in her job, she frequently lifted less than ten pounds, sat for approximately three hours per day and stood or walked for approximately four hours per day, which closely mirrors the exertional requirements for light work (Tr. 219), which is defined as work that involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds… a job is in this [exertional] category when it requires a good deal of walking or standing . . . ." 20 C.F.R. §§ 404.1567(b), 416.967(b). The *DOT* identified the "administrative clerk" job as falling in the light exertional category, closely matching the plaintiff's self-described activities. *See DOT* 219.362-010, 1991 WL 671953.

The plaintiff argues that the ALJ erred by failing to obtain vocational expert testimony to clarify the most accurate *DOT* job title to describe her past work. However, as argued by the Commissioner, no regulation or ruling imposes such a requirement. Indeed, Social Security Ruling 82-62 permits the ALJ to rely on the *DOT* to assess the requirements of the plaintiff's work as generally performed in the economy. *See* SSR 82-61, 1982 WL 31387, at *2.

Furthermore, as argued by the Commissioner, the definition of the position of administrative assistant contained in the *DOT* differs significantly from the plaintiff's

description of her past job as she performed it. *See DOT* 169.167-010, 1991 WL 647424. The DOT places the job in the "sedentary" exertional category, meaning it requires lifting no more than ten pounds at a time and generally requires no more than two hours of standing and walking in an eight-hour day. *Id. See* 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185. The administrative assistant job as defined by the *DOT* entails the following duties:

> Aids executive in staff capacity by coordinating office services, such as personnel, budget preparation and control, housekeeping, records control, and special management studies: Studies management methods in order to improve workflow, simplify reporting procedures, or implement cost reductions. Analyzes unit operating practices, such as recordkeeping systems, forms control, office layout, suggestion systems, personnel and budgetary requirements, and performance standards to create new systems or revise established procedures. Analyzes jobs to delimit position responsibilities for use in wage and salary adjustments, promotions, and evaluation of workflow. Studies methods of improving work measurements or performance standards. Coordinates collection and preparation of operating reports, such as time-and-attendance records, terminations, new hires, transfers, budget expenditures, and statistical records of performance data. Prepares reports including conclusions and recommendations for solution of administrative problems. Issues and interprets operating policies. Reviews and answers correspondence. May assist in preparation of budget needs and annual reports of organization. May interview job applicants, conduct orientation of new employees, and plan training programs. May direct services, such as maintenance, repair, supplies, mail, and files. May compile, store, and retrieve management data, using computer.

*See DOT* 169.167-010, 1991 WL 647424.

As argued by the Commissioner, the position clearly requires a significant deal of management analysis that the plaintiff never described as pertinent in her past position (Tr. 219). The ALJ provided a persuasive explanation for why the job of administrative clerk as defined by the *DOT* more closely matched the plaintiff's general job duties and responsibilities as she described them (Tr. 26-27). Moreover, while the plaintiff argues that

36

"even mild mental limitations and chronic pain could certainly impact jobs requiring R4 and R5 reasoning levels" (pl. brief at 25), the ALJ specifically found that the plaintiff's mental impairments resulted in "no related limitations," and, as discussed above, this finding is based upon substantial evidence. Based upon the foregoing, the ALJ's well-reasoned step four finding should not be disturbed.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

September 3, 2014
Greenville, South Carolina

37